LOVEKIN v. LOVEKIN & INGLE

[140 N.C. App. 244 (2000)]

———————————

STEPHEN L. LOVEKIN, Employee, Plaintiff v. LOVEKIN AND INGLE, Employer; FIRST OF GEORGIA INSURANCE, Carrier; Defendants

No. COA99-1069

(Filed 3 October 2000)

**Workers' Compensation— injury by accident—multiple events**

The Industrial Commission erred in a workers' compensation action by concluding that plaintiff sustained an injury by accident where plaintiff, an attorney, suffered an acute cardiac incident and underwent coronary artery bypass surgery as a result of stressful events in the preceding months. Multiple events over a period of time do not constitute an accident, which must result from an event.

Appeal by defendants from opinion and award filed 21 August 1997 by the Full Commission of the North Carolina Industrial Commission and from supplemental opinion and award filed 3 May 1999 by Deputy Commissioner George T. Glenn, II. Heard in the Court of Appeals 15 August 2000.

LOVEKIN v. LOVEKIN & INGLE

[140 N.C. App. 244 (2000)]

*Patrick, Harper & Dixon, LLP, by Gary F. Young, for plaintiff-appellee.*

*Stiles Byrum & Horne, L.L.P., by Henry C. Byrum, Jr., for defendant-appellants.*

GREENE, Judge.

Lovekin and Ingle (Employer) and First of Georgia Insurance (collectively, Defendants) appeal an opinion and award of the Full Commission of the North Carolina Industrial Commission (Full Commission) filed on 21 August 1997, in favor of Stephen L. Lovekin (Plaintiff).

The evidence shows that on 12 July 1993, Plaintiff, an attorney, was employed as a senior partner with Employer. Plaintiff began his work with Employer in 1980, when he entered into a partnership with John Ingle (Ingle) to form Employer. Plaintiff practiced in a variety of areas of law; however, the focus of his practice in 1992 and 1993 was personal injury cases. The staff of attorneys working for Employer at that time consisted of Plaintiff, Ingle, and Leslie Yount (Yount). Plaintiff testified that in 1992 and 1993, several events occurred that altered his workload with Employer. In 1992, the number of cases being handled by Employer "grew considerably." This increase "was the beginning of some of the stress that was put on" Plaintiff in 1992 and 1993. In addition, there was "employee discontent," and in December of 1992, Yount left her employment with Employer. Then, in January of 1993, an employee who worked as a paralegal and office manager also left her employment. Finally, in March of 1993, a legal assistant left her employment. Although Plaintiff worked approximately nine or ten hours per day in 1992, near the end of 1992 and in the beginning of 1993 he began working "fifteen, sixteen, seventeen, eighteen hours a day trying to keep up" due, in part, to the departure of the employees. In January of 1993, Employer hired a new associate to assist with the increased workload; however, the associate did not perform his work as expected, and he left Employer in April or May of 1993. Plaintiff described the difficulties relating to the new associate as "another stressor." Plaintiff testified the "anxiety that [he] experienced in trying to keep [his] head above water . . . increased tenfold" during this time. Plaintiff's work was also affected by a malpractice lawsuit which had been filed against Employer. In 1992 and 1993, this malpractice lawsuit was in the discovery stage and "created distraction and stress." At the same time, Plaintiff was threatened

with the possibility of another malpractice lawsuit, which "required a great deal of [Plaintiff's] time."

In addition to an increased workload, Plaintiff testified regarding changes in his financial obligations that occurred in 1992 and 1993. In October of 1992, Employer decided to purchase the building in which its offices were located, and Plaintiff and Ingle personally guaranteed a loan for the purchase of the building and renovations to the building. Additionally, beginning in November of 1992 and continuing for several months, the Internal Revenue Service completed an audit of Plaintiff and Employer that it had begun in 1991. The audit resulted in a tax liability totaling $120,000.00, including $30,000.00 in taxes for which Plaintiff was personally responsible. Finally, in 1993, Employer conducted an internal investigation of its trust account due to a discrepancy in the trust account records, and this investigation required many hours of work by employees. Employer discovered prior to 12 July 1993, however, that the cause of the discrepancy was a numerical error.

Plaintiff testified that on 12 July 1993, he arrived at work at approximately 8:30 a.m. Plaintiff spent the morning working in the office, and went to lunch at approximately 12:15 p.m. Sometime after his arrival at work, Plaintiff felt "extremely tired and stressed out." Plaintiff did not testify, however, that any unusual events occurred on this day to cause him to feel "extremely tired and stressed out." When Plaintiff returned to his office from lunch at approximately 1:00 p.m., the office manager noticed that he appeared pale and she drove him to a doctor's office. Plaintiff was diagnosed as having "an acute cardiac incident," and he was taken to the hospital. At the hospital, Plaintiff underwent coronary artery bypass surgery.

F. Michael Crouch, M.D. (Dr. Crouch), an expert in cardiothoracic surgery, performed Plaintiff's 12 July 1993 surgery. Dr. Crouch stated Plaintiff suffered from coronary artery disease. In Dr. Crouch's opinion, "work-related stressors . . . probably did contribute to the worsening cardiac status of [Plaintiff] and played a part in him having to have heart surgery." Dr. Crouch stated that Plaintiff had three "very strong risk factors for developing coronary artery disease": diabetes that required Insulin, a family history of heart disease, and a history of smoking. Additionally, Norris Brown Harbold, Jr., M.D. (Dr. Harbold), a medical doctor specializing in cardiovascular disease, testified he reviewed Plaintiff's medical chart subsequent to Plaintiff's surgery. Dr. Harbold testified Plaintiff suffered from coronary heart

disease. He stated that in his opinion, " 'stress was . . . an aggravating factor in a long buildup of this disease.' "

In an opinion and award filed 29 August 1996, the Deputy Commissioner denied Plaintiff's workers' compensation claim, concluding Plaintiff's surgery did not result from an "injury by accident." Plaintiff appealed the opinion and award of the Deputy Commissioner to the Full Commission.

In an opinion and award filed on 21 August 1997, the Full Commission made findings of fact consistent with the above-stated facts, including the following pertinent findings of fact:

12. . . . [T]he unusually high level of stress suffered by [Plaintiff] in the months prior to his attack triggered, aggravated, or accelerated his acute cardiac incident necessitating emergency coronary by-pass surgery.

. . . .

16. . . . The stressful events in the months preceding the attack were directly related to the business of the law practice of [Employer]. This series of events were not events which were a part of the usual and customary practice of law experienced by [Plaintiff] previously.

The Full Commission then made the following pertinent conclusions of law:

1. Increased work related stresses preceding his heart attack constituted an interruption of his normal work routine for [P]laintiff. . . .

2. On 12 July 1993, [P]laintiff sustained an injury by accident arising out of and in the course of his employment when he experienced an acute cardiac incident as the result of unusual levels of work related stress.

Based on these conclusions of law, the Full Commission awarded Plaintiff the cost of "medical treatment incurred by [P]laintiff as a result of his injury by accident, including the emergency by-pass surgical procedure" and "other compensation to which [P]laintiff is entitled, if any, as may be agreed to by the parties or determined by a Deputy Commissioner after hearing."

LOVEKIN v. LOVEKIN & INGLE

[140 N.C. App. 244 (2000)]

The dispositive issue is whether a series of events, which occur over a period of approximately eight months and cause injury to an employee, constitute an "accident" within the meaning of the North Carolina Workers' Compensation Act.

Plaintiff argues "the legislature has not excluded all multiple events occurring over a period of time from the definition of accident." We disagree.

The term "accident," within the meaning of the North Carolina Workers' Compensation Act, is defined as: "(1) an unlooked for and untoward event which is not expected or designed by the injured employee; (2) a result produced by a fortuitous cause." *Harding v. Thomas & Howard Co.*, 256 N.C. 427, 428, 124 S.E.2d 109, 110-11 (1962). Under this well-established definition of "accident," an accident must result from "an . . . event," and multiple events occurring over a period of time, therefore, do not constitute an "accident."[1] *Cf.* N.C.G.S. § 97-52 (1999) (series of events occurring over extended period of time do not constitute "accident" and may constitute occupational disease).

An "accident" is inferred by the occurrence of "an interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences." *Gunter v. Dayco Corp.*, 317 N.C. 670, 673, 346 S.E.2d 395, 397 (1986).[2] Unusual conditions, however, do not interrupt an employee's work routine when "the employee has gained proficiency performing in the new employment

---

1. In support of his argument that "multiple events occurring over a period of time" may constitute an "accident," Plaintiff cites *Larson's Workers' Compensation Law*. Larson states that an injury not compensable as an occupational disease may be compensable as an "accident" even if the injury is "gradual in onset and consequences." 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 50.06 (2000) [hereinafter *Larson's Workers' Compensation Law*]. Further, Larson notes that "the accident and causal concepts are in many . . . ways so commingled that it is impossible to segregate them," 2 *Larson's Workers' Compensation Law* § 46.02, and "[t]he only valid and distinctive function of the words 'by accident' is to introduce the requirement of genuine unexpectedness," *id.* § 46-03[6]. While Larson's statements may have merit, the North Carolina Supreme Court has rejected any broadening of the "accident" element of a workers' compensation claim on the ground that any change to the definition of "accident" must come from the General Assembly. *Harding*, 256 N.C. at 429, 124 S.E.2d at 111; *Hensley v. Cooperative*, 246 N.C. 274, 280-81, 98 S.E.2d 289, 293-94 (1957) (noting interpretation of "accident" in North Carolina differs from majority of jurisdictions and stating that any change to definition must nevertheless be made by legislature).

2. *Gunter* does not *define* "accident" as "an interruption of the work routine and the introduction thereby of unusual conditions likely to result in unexpected consequences"; rather, it states such an interruption in the work routine results in an *infer-*

LOVEKIN v. LOVEKIN & INGLE

[140 N.C. App. 244 (2000)]

and become accustomed to the conditions it entails." *Id.* at 675, 346 S.E.2d at 398.

In this case, the Full Commission did not find as fact that a particular event occurred which caused Plaintiff's "acute cardiac incident." Rather, the Full Commission found as fact, in pertinent part, that Plaintiff experienced several "stressful events in the months preceding the attack" and "the unusually high level of stress suffered by [Plaintiff] in the months prior to his attack triggered, aggravated, or accelerated his acute cardiac incident necessitating emergency coronary by-pass surgery." These findings of fact, because they rely on several events occurring over an extended period of time, do not support the Full Commission's conclusion of law that "[P]laintiff sustained an injury by accident" within the meaning of the North Carolina Workers' Compensation Act. *See Hemric v. Manufacturing Co.*, 54 N.C. App. 314, 316, 283 S.E.2d 436, 437-38 (1981), *disc. review denied*, 304 N.C. 726, 288 S.E.2d 806 (1982) (appellate review of decision of the Full Commission is limited to whether the record contains competent evidence to support the findings of fact and whether the findings of fact support the Full Commission's conclusions of law). Accordingly, the opinion and award of the Full Commission is reversed.[3]

Because the opinion and award of the Full Commission is reversed, we need not address Defendants' additional assignments of error.

Reversed.

Judges EDMUNDS and SMITH concur.

---

*ence* that an accident has occurred. *Gunter*, 317 N.C. at 673, 346 S.E.2d at 397. We, therefore, do not read *Gunter*, and cases that rely on *Gunter*, as expanding the definition of "accident" in North Carolina. *See, e.g., Dye v. Shippers Freight Lines*, 118 N.C. App. 280, 282, 454 S.E.2d 845, 847 (1995).

3. Plaintiff argues in his brief to this Court that his coronary heart disease may also be compensable under the North Carolina Workers' Compensation Act as an occupational disease. The Full Commission, however, did not determine whether Plaintiff's coronary heart disease constitutes an occupational disease. Because Plaintiff did not cross-assign error to the opinion and award of the Full Commission, this argument is not properly before this Court. *See* N.C.R. App. P. 10(d) (appellee may cross-assign error to omission of trial court when omission raises "an alternative basis in law" for supporting the order of the trial court).