DAVIS, Judge.
*563 Tropical Nut & Fruit Co. ("Tropical") and Farmington Casualty Co. (collectively "Defendants") appeal from the Opinion and Award of the North Carolina Industrial Commission ("the Commission") awarding Timothy W. Holliday ("Plaintiff") workers' compensation benefits. On appeal, Defendants argue that the Commission erred in (1) concluding that Plaintiff's injury arose out of his employment; (2) determining that Plaintiff sustained a compensable injury by accident; and (3) awarding Plaintiff temporary total disability benefits. After careful review, we affirm the Commission's Opinion and Award.
*564 Factual Background
Plaintiff is a 54-year-old man who, at the time of his injury, had been employed by Tropical as a territory manager and outside sales representative in Asheville, North Carolina for approximately one and a half years. From 18 August to 20 August 2011, Plaintiff attended Tropical's annual three-day National Sales and Marketing Conference ("the Conference") in Charlotte, North Carolina. At the Conference, Tropical discussed the past year's sales, introduced new products, held training sessions, discussed prospective strategies for the company, presented end-of-year awards, and provided an opportunity for the employees to meet vendors as well as colleagues who worked for Tropical in various other locations.
Attendance at the Conference was mandatory for Plaintiff. He was paid his normal salary during the three days the Conference was held, and he was not permitted to bring his spouse or children to the Conference.
On 18 August 2011, the first evening of the Conference, Tropical organized a social event at Sports Connection in Charlotte for the members of its sales staff who were attending the Conference. The activities consisted of bowling and laser tag. Tropical paid all of the expenses for the activities, assigned the *888 employees to teams, and informed the employees which activity they would be assigned to participate in-laser tag or bowling-upon their arrival at the event.
Plaintiff's first assigned activity was laser tag. During the game, Plaintiff was "covering the floor [of the laser tag arena], and going up and down ramps, and twisting and bending around columns, trying to catch people ... with the laser." Approximately 15 minutes into the game, Plaintiff "started feeling some sharp pain" in his leg, which became severe when he attempted to continue the game. As a result, Plaintiff remained in one location and "[took] it a little easier ... until the thirty minutes was up."
At that point, Plaintiff was "in quite a bit of pain" and "had a very noticeable limp." He sat down to remove his laser tag gear and informed his general manager that he believed he had hurt his right knee. Plaintiff applied ice to his knee and was able to attend the remainder of the Conference.
He continued to perform his job duties once he returned from the Conference to Asheville, but his right knee pain persisted and he scheduled an appointment with Dr. Thomas Baumgarten ("Dr. Baumgarten"), *565 an orthopedist, for 30 August 2011. During this appointment, Dr. Baumgarten observed that Plaintiff had fluid in his right knee joint, tenderness along the medial joint line, and "a positive McMurray's test which is usually indicative of some type of torn meniscus or torn cartilage." An MRI scan revealed tears to the medial meniscus and the lateral meniscus.
On 3 October 2011, Plaintiff underwent arthroscopic right knee surgery to repair the meniscal tears. Plaintiff did not miss work due to his right knee pain or surgery and was able to continue performing his job duties until he was laid off on 13 July 2012 due to a company-wide restructuring.
On 25 October 2012, Plaintiff saw Dr. Jesse West ("Dr. West"), an orthopedic specialist, for a second opinion concerning his right knee following the arthroscopic surgery. Dr. West noted chondromalacia, or cartilage damage, to Plaintiff's right knee and referred him to Dr. T. Marcus Barnett ("Dr. Barnett") based on his determination that Plaintiff required a total knee replacement. Dr. West also completed a "work status report," which stated that Plaintiff could return to work with modified duties, meaning that he was restricted from "prolonged standing or walking," lifting over ten pounds, and squatting, kneeling, or twisting. Dr. West further noted on this document that if modified duties were not available, Plaintiff should be considered "off work."
During this time, Plaintiff experienced low back pain, which radiated down his right buttock, hip, and thigh. Plaintiff underwent back surgery on 9 January 2013 to repair a disc herniation at S1-2 with moderate stenosis at L3-4 and L4-5. After Plaintiff recovered from his back surgery[1] , Dr. Barnett performed a total knee replacement of his right knee on 24 May 2013. Plaintiff had not yet had his first postoperative visit at the time of Dr. Barnett's deposition on 11 June 2013, but in his deposition testimony Dr. Barnett anticipated that Plaintiff would have a three-to six-month recovery period following the total knee replacement.
Plaintiff filed a Form 18 seeking workers' compensation benefits in connection with his 18 August 2011 injury, and Defendants filed a Form 61 denying Plaintiff's claim. Plaintiff requested that his claim be assigned for hearing, and on 28 August 2012, the claim was heard by Deputy Commissioner George R. Hall, III. Deputy Commissioner Hall *566 filed an opinion and award on 26 August 2013 concluding that "Plaintiff sustained a compensable right knee injury on August 18, 2011, which required surgical correction and ultimate knee replacement which were both necessitated by the aggravation caused by his laser tag injury" and that Plaintiff was temporarily totally disabled. Consequently, Deputy Commissioner Hall awarded Plaintiff temporary total disability benefits and ordered Defendants to provide any medical treatment reasonably required to effect a *889 cure and provide relief for his right knee injury. Defendants appealed to the Full Commission, and the Commission affirmed the deputy commissioner's decision in an Opinion and Award entered 10 June 2014. Defendants filed a timely notice of appeal to this Court.
Analysis
Our review of an opinion and award of the Industrial Commission is "limited to consideration of whether competent evidence supports the Commission's findings of fact and whether the findings support the Commission's conclusions of law." Richardson v. Maxim Healthcare/Allegis Grp., 362 N.C. 657, 660, 669 S.E.2d 582, 584 (2008). When reviewing the Commission's findings of fact, this Court's "duty goes no further than to determine whether the record contains any evidence tending to support the finding[s]." Id. (citation and quotation marks omitted).
The findings of fact made by the Commission are conclusive on appeal if supported by competent evidence even if there is also evidence that would support a contrary finding. Nale v. Ethan Allen, 199 N.C.App. 511, 514, 682 S.E.2d 231, 234, disc. review denied, 363 N.C. 745, 688 S.E.2d 454 (2009). The Commission's conclusions of law, however, are reviewed de novo. Gregory v. W.A. Brown & Sons, 212 N.C.App. 287, 295, 713 S.E.2d 68, 74, disc. review denied, - -- N.C. ----, 719 S.E.2d 26 (2011). Evidence supporting the plaintiff's claim is to be viewed in the light most favorable to the plaintiff, and the plaintiff is entitled to the benefit of any reasonable inferences that may be drawn from the evidence. Adams v. AVX Corp., 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998).
Under the Workers' Compensation Act ("the Act"), an injury is compensable if the claimant proves three elements: "(1) that the injury was caused by an accident; (2) that the injury was sustained in the course of the employment; and (3) that the injury arose out of the employment." Hedges v. Wake Cty. Pub. Sch. Sys., 206 N.C.App. 732, 734, 699 S.E.2d 124, 126 (2010) (citation and quotation marks omitted), disc. review denied, 365 N.C. 77, 705 S.E.2d 746 (2011). In the present case, Defendants contend that Plaintiff's injury is not compensable because *567 (1) the injury did not arise out of his employment; and (2) the injury was not caused by an accident for purposes of the Act. Defendants further contend that the Commission erred in awarding Plaintiff total temporary disability benefits. We address each of these arguments in turn.
I. "Arising Out of" Element
Defendants' primary contention on appeal is that Plaintiff's injury is not compensable because it did not arise out of his employment with Tropical. We disagree.
The "arising out of the employment" element of compensability refers to "the origin or cause of the accident," and in order to satisfy this element, "the employment must be a contributing cause or bear a reasonable relationship to the employee's injuries." Morgan v. Morgan Motor Co. of Albemarle, ---N.C.App. ----, ----, 752 S.E.2d 677, 680 (2013) (citations and quotation marks omitted), aff'd per curiam, 368 N.C. 69, 772 S.E.2d 238 (2015). Defendants here assert that because participation in the laser tag event was not mandatory, the event was a "fun outing" that did not provide any measurable benefit to Tropical. Defendants consequently challenge the Commission's findings that reach a contrary result, arguing that the Commission's resulting determination that Plaintiff's injury arose from his employment is contrary to established caselaw.
A. Findings of Fact
The Commission made the following pertinent findings of fact in support of its determination that Plaintiff's injury arose from his employment:
2. On August 18, 2011, Plaintiff attended Defendant-Employer's National Sales and Marketing Conference in Charlotte, North Carolina, an annual event that included various scheduled activities, including sales meetings, new product meetings, dinners, award ceremonies, pastry training, video production of spoof commercials, a Jeopardy game, bowling, and laser tag. It was mandatory that Plaintiff attend the conference, *890 and he was not permitted to bring his family with him. During the entire time he was at the conference, from Thursday, August 18 through the afternoon of Saturday, August 20, 2011, Plaintiff was considered to be working, and as a salaried employee, he was paid his normal salary. *568 3. Defendant-Employer paid for and controlled every aspect of the conference for its 68 participants, including making airline reservations for those employees who were flying in from other parts of the country, making hotel reservations, assigning rooms and roommates, making dinner reservations, choosing and scheduling all events, including laser tag, and assigning the attendees to teams for the various activities. The cost and expenses associated with the conference were written-off by Defendant-Employer as necessary business expenses.
4. Defendant-Employer held its annual conference to recap the year's sales, to introduce new products, to give end of year awards, and to give sales persons an opportunity to meet vendors and network with colleagues who worked in other cities. Training was provided during the structured parts of the conference to talk about products, strategies, and goals. The "fun" parts of the conference were scheduled to thank, recognize and encourage the employees and to give them "all the chances they can to be with the other folks from other operational centers." Attendance at all scheduled functions, including the "fun" activities, was mandatory, and attendance was taken because "the whole idea was to get people together so they would meet new people...." Defendant-Employer's President, John Bauer, testified that it "was not meant to be an employee appreciation event-it's more of a business event."
5. For the 2011 annual conference, the "fun" activity that Defendant-Employer scheduled for the attendees was an evening of laser tag and bowling at the Sports Connection in Charlotte. Conference attendees were emailed directions to Sports Connection in advance of the conference, and they were given tickets purchased by Defendant-Employer to buy drinks. All conference attendees were expected to attend the event at the Sports Connection, and attendance was taken to make sure no one skipped the event. Arnold Stone, Defendant-Employer's VP of Marketing and Sales, testified that the laser tag and bowling were considered to be part of the meeting content and that "the overall evening was an essential part of the meeting content." However, while attendance was *569 required, participation in the laser tag and bowling activities was not required, and if an attendee did not feel comfortable participating for whatever reason, there would be no adverse consequences in terms of his status with Defendant-Employer. In this regard, Mr. Stone testified that, "we wanted people to participate but there weren't any requirements-it's more of a bonding exercise."
6. On August 18, 2011, during the required business outing, Plaintiff and the other employees attending the conference were assigned to teams to play laser tag. Plaintiff testified that while playing laser tag for approximately 20 minutes, he walked up and down ramps, crouched behind walls and other obstacles, and quickly and repeatedly twisted in an effort to shoot the opposing team and score points for his team. Plaintiff confirmed, and the Full Commission finds, that these activities were not activities he normally performed as a Territory Manager/Outside Sales Representative for Defendant-Employer.
7. Plaintiff testified, and the Full Commission finds, that about half-way through the laser tag event, after he had been running up and down ramps and twisting and bending around columns, Plaintiff began to experience pain in his right knee. By the time the laser tag ended, Plaintiff was in quite a bit of pain, so he told his supervisor that he thought he hurt his knee playing laser tag.
....
22. On August 18, 2011, Plaintiff sustained an injury by accident to his right knee arising out of and in the course of his employment with Defendant-Employer. Playing laser tag constituted an interruption of Plaintiff's regular work routine and the introduction of unusual conditions likely to result in unexpected consequences.
*891 ....
24. Because Defendant-Employer sponsored and paid for the annual conference, which had a substantial business purpose, maintained a known custom of requiring its employees to attend the conference, took a record of attendance at each conference event, including the "fun" events, and financed and scheduled all events at *570 the conference, the injury Plaintiff sustained while playing laser tag arose out of his employment with Defendant-Employer. Plaintiff's trip to the conference and his participation in all events scheduled during the conference by Defendant-Employer, was calculated to further, directly or indirectly, Defendant-Employer's business.
Of the above-quoted findings of fact, Defendants challenge findings 3, 4, and 24 on appeal.[2] With regard to finding of fact 3, Defendants contend that the portion of the finding stating that Tropical "paid for and controlled every aspect of the conference for its 68 participants" is unsupported by competent evidence. Because the record does not "in any way indicate [ ] employees were required by Tropical to physically participate in the Laser Tag/bowling activities," Defendants assert, there was "no support for the Commission's determination in Finding of Fact 3 that all aspects of the Sales Conference were controlled by Tropical."
The itinerary for the Conference set forth a detailed schedule of meetings, trainings, and activities for the three-day duration of the event. Beginning at 4:00 p.m. on Thursday afternoon, employees were scheduled for back-to-back events until 10:00 p.m. The programmed events commenced again at 8:00 a.m. on Friday and proceeded until 10:00 p.m. that night. The schedule for the final day of the Conference included meetings from 8:00 a.m. to 1:30 p.m. Other than the evenings (after 10:00 p.m.) and a few 15-minute breaks, the employees were in organized activities for the entire Conference. Tropical's President, John Bauer ("Bauer"), testified that Tropical covered all of the expenses associated with the Conference. He further explained that the Conference is "once a year and the expectation is clear that [employees] are to attend all the events."
Thea Hatton ("Hatton"), one of the sales managers for Tropical, likewise testified that the whole Conference was a "package," and *571 the employees were required to attend all portions of it. Another employee, Tobey Marshall ("Marshall"), similarly reported that the entire Conference was "a coordinated series of events" and that it was mandatory for Conference participants to attend the laser tag and bowling outing, as well as all of the other scheduled events. This evidence demonstrates that Tropical specifically planned each segment of the Conference and ensured turnout at each event by expressly mandating the employees' attendance. We therefore conclude that there was copious competent evidence supporting the Commission's finding that Tropical controlled and paid for all components of the Conference.
Defendants next challenge the Commission's characterization of the laser tag and bowling activities in findings of fact 4 and 24 as more of a "business event" that "was calculated to further, directly or indirectly, Defendant-Employer's business" than a social or "employee appreciation" event. Defendants assert that (1) the laser tag outing was separate and distinct from the business portions of the Conference; and (2) there was no evidence offered to demonstrate that this activity "provided anything other than an immeasurable benefit to Tropical employee morale." Defendants' argument lacks merit.
Arnold Stone ("Stone"), Tropical's vice president of marketing and sales, testified *892 that the overall evening at Sports Connection "was an essential part" of the three-day event and characterized the outing as part of the "team building" and "networking" content of the Conference. He explained that the Conference had a pretty tightly packed schedule with "not a whole lot of time for networking." He then described "networking" as "get[ting] to know people, just ... get[ting] to meet people" and testified that the Sports Connection event was designed "to get people together so they would meet new people ... and have fun together."
Hatton likewise stated that "the laser tag and bowling was an activity to help us meet the people that we work with every single day" and helped "[p]ut a name with the face-or with the voice ... I talked to on a daily basis in the other divisions." Marshall testified that she believed the laser tag and bowling outing served a beneficial purpose to Tropical's business because the event facilitated interaction between employees at various offices and Tropical "want [ed] us to meet everybody at the other offices and kind of have a relationship because we do sometimes have to call ... [and] ask for something." Thus, this testimony supported the Commission's finding that the laser tag and bowling event was an essential part of the Conference's content and served a business purpose for Tropical.
*572 Although Bauer gave testimony to the effect that the outing was not work- or business-related-testifying that the purpose of it was "[t]otally a social event, a thank you for coming to the event, and for a good sales year"-this testimony does not negate the fact that other competent evidence existed in the record to support the Commission's finding to the contrary. Our Supreme Court has repeatedly explained that when reviewing an opinion and award from the North Carolina Industrial Commission, the Commission's findings are binding if supported by competent evidence even if there is also evidence in the record that would support contrary findings. Deese v. Champion Int'l Corp., 352 N.C. 109, 115, 530 S.E.2d 549, 552-53 (2000).
An appellate court is not permitted "to weigh the evidence and decide the issue on the basis of its weight"; rather, our duty "goes no further than to determine whether the record contains any evidence tending to support the finding." Id. at 115, 530 S.E.2d at 552 (citation and quotation marks omitted); see also Philbeck v. Univ. of Mich., --- N.C.App. ----, ----, 761 S.E.2d 668, 674 (2014) (explaining that because the Commission is the "sole judge of the credibility of the witnesses and the weight to be given their testimony.... its determinations regarding the credibility of witnesses or the weight certain evidence is to be accorded are not reviewable on appeal." (citations and quotation marks omitted)). Consequently, because findings of fact 4 and 24 are supported by the testimony of Stone, Hatton, and Marshall, these findings are binding on appeal.
As we have determined that the Commission's findings of fact on this issue are supported by competent evidence in the record, we next turn to whether these findings adequately support the Commission's conclusion that Plaintiff's injury arose from his employment.
B. North Carolina Caselaw Analyzing Injuries Sustained at Employer-sponsored Events
Our appellate courts have addressed on a number of occasions the applicability of the Act to injuries sustained by employees during employer-sponsored social and recreational events. See Frost v. Salter Path Fire & Rescue, 361 N.C. 181, 185, 639 S.E.2d 429, 433 (2007) ("The Act's application to injuries occurring during recreational and social activities related to employment is well established in the jurisprudence of North Carolina."). In Perry v. Am. Bakeries Co., 262 N.C. 272, 136 S.E.2d 643 (1964), our Supreme Court set out guiding principles to be considered when determining the compensability of an injury sustained by an employee in this context. The plaintiff in Perry suffered a *573 fractured cervical vertebra after diving into a hotel pool while attending an out-of-town sales conference that the defendant-employer arranged and financially sponsored. Id. at 273, 136 S.E.2d at 644-45. The Supreme Court explained that in determining whether the injury arose out of the plaintiff's employment,
*893 [t]he question is whether [the plaintiff's] use of the pool was an authorized activity calculated to further, directly or indirectly, his employer's business, or whether it was employment connected to the extent that it may be concluded that there was a causal relation between the employment and the accident and the accident resulted from a risk involved in the employment. In providing plaintiff accommodations at Sedgefield Inn the employer provided him the recreational facilities maintained by the Inn for its guests. These recreational facilities undoubtedly influenced the employer in selecting Sedgefield Inn as the site for the meeting. Plaintiff was not required or expressly invited by his employer to use the swimming pool, but during his free time he was at liberty to use it. By providing the facility for him the employer impliedly invited him to use it, and he could swim or not at his option. Where, as a matter of good will, an employer at his own expense provides an occasion for recreation or an outing for his employees and invites them to participate, but does not require them to do so, and an employee is injured while engaged in the activities incident thereto, such injury does not arise out of the employment. Plaintiff's activity in swimming was not a function or duty of his employment, was not calculated to further directly or indirectly his employer's business to an appreciable degree, and was authorized only for the optional pleasure and recreation of plaintiff while off duty during his stay at the Inn. The injury did not have its origin in or arise out of the employment.
Id. at 274-75, 136 S.E.2d at 646 (internal citations omitted).
The Supreme Court acknowledged three scenarios where an injury sustained during a recreational or social activity would be compensable: (1) when it occurs "on the premises during a lunch or recreation period as a regular incident of the employment"; (2) when the employer "by expressly or impliedly requiring participation, or by making the activity part of the services of an employee, brings the activity within the orbit of the employment"; and (3) when the employer derives a benefit from the *574 activity "beyond the intangible value of improvement in [the] employee's health and morale that is common to all kinds of recreation and social life." Id. at 275, 136 S.E.2d at 646. The Court concluded that "the case at bar does not qualify for compensation ... under these rules or suggested guides." Id.
In Chilton v. Bowman Gray Sch. of Med., 45 N.C.App. 13, 262 S.E.2d 347 (1980), this Court adopted a six-factor inquiry to further guide compensability determinations for injuries sustained at employer-sponsored recreational and social activities.
(1) Did the employer in fact sponsor the event?
(2) To what extent was attendance really voluntary?
(3) Was there some degree of encouragement to attend evidenced by such factors as:
a. taking a record of attendance;
b. paying for the time spent;
c. requiring the employee to work if he did not attend; or
d. maintaining a known custom of attending?
(4) Did the employer finance the occasion to a substantial extent?
(5) Did the employees regard it as an employment benefit to which they were entitled as of right?
(6) Did the employer benefit from the event, not merely in a vague way through better morale and good will, but through such tangible advantages as having an opportunity to make speeches and awards?
Id. at 15, 262 S.E.2d at 348. While these factors are not controlling, they can "serve as helpful guideposts" in the inquiry of whether an injury incurred by an employee at such an event arose out of the employment. Frost, 361 N.C. at 187, 639 S.E.2d at 434.
Defendants direct our attention to Frost, Perry, and Chilton, as well as to the following additional cases, in which our appellate courts have determined that the injuries sustained by employees at recreational or social events did not arise out of employment: Berry *894 v. Colonial Furniture Co., 232 N.C. 303, 60 S.E.2d 97 (1950), Graven v. N.C. Dep't *575 of Pub. Safety-Div. of Law Enforcement, --- N.C.App. ----, 762 S.E.2d 230 (2014), and Foster v. Holly Farms Poultry Indus., Inc., 14 N.C.App. 671, 189 S.E.2d 744,cert. denied, 281 N.C. 621, 190 S.E.2d 465 (1972).
In Frost, the plaintiff, an emergency medical technician for Salter Path Fire & Rescue ("Fire & Rescue"), was injured in a go-cart accident while attending a "Fun Day" organized by the community to thank the Fire & Rescue staff and volunteers. Frost, 361 N.C. at 182-83, 639 S.E.2d at 431. The Supreme Court concluded that the plaintiff's injury did not arise from her employment because she attended the event "on a purely voluntary basis" and the activities "were authorized merely for her optional pleasure and recreation while she was off duty." Id. at 186-88, 639 S.E.2d at 433-34.
In Perry, as discussed above, the Supreme Court held that the plaintiff's injury at a hotel swimming pool the day before an employer-sponsored conference did not arise from his employment. The Court reached this result because the plaintiff's "activity in swimming ... was not calculated to further directly or indirectly his employer's business to an appreciable degree, and was authorized only for the optional pleasure and recreation of plaintiff while off duty during his stay at the Inn." Perry, 262 N.C. at 275, 136 S.E.2d at 646.
Berry involved a company-sponsored fishing trip to the coast "after the store had closed for the day's work on Saturday." Berry, 232 N.C. at 306, 60 S.E.2d at 100 (internal quotation marks omitted). The Supreme Court concluded that the plaintiff's injury, which was sustained when he fell out of the company truck on the way to the coast, did not arise from his employment because "[b]usiness hours were over," and there was no connection between the "trip for pleasure" and the employment. Id. at 307, 60 S.E.2d at 100.
Graven involved injuries sustained by two employees when their vehicle spun out of control after encountering a patch of ice on the way back from a holiday lunch "to celebrate the department's hard work." Graven, --- N.C.App. at ----, 762 S.E.2d at 232 (quotation marks omitted). Because attendance at the lunch was purely voluntary, employees were required to pay for their own meals, and no formal speeches or awards were presented at the event, we concluded that "the holiday lunch is similar to the type of event that is described in Perry ... which the Supreme Court stated would not arise out of the employment." Id. at ----, 762 S.E.2d at 235.
In Chilton, the plaintiff, a professor at a medical school, broke his ankle while playing volleyball at a picnic organized by the medical school *576 faculty so that incoming residents could become acquainted with faculty members. Chilton, 45 N.C.App. at 13-14, 262 S.E.2d at 347-48. This Court concluded that the plaintiff's injury did not arise from his employment based on the fact that (1) it was "not clear that the radiology department sponsored the picnic"; (2) attendance was voluntary and while faculty members "felt they should go ... they were not compelled to do so"; (3) the participants were not paid for the time spent at the picnic; (4) the picnic " was not an event that [an] employee regarded as being a benefit to which he was entitled as a matter of right"; and (5) "the radiology department did not utilize the picnic as an opportunity to give a 'pep' talk or grant awards." Id. at 17-18, 262 S.E.2d at 350.
Finally, in Foster, this Court concluded that the plaintiff's fatal injury, which occurred when he was robbed by two men and shot while attending a conference that "had no connection with [the plaintiff's] work at [the defendant-employer's business]," did not arise from his employment with the defendant-employer. Foster, 14 N.C.App. at 672, 189 S.E.2d at 744. We held that because the evidence demonstrated that the plaintiff's attendance at the conference was solely for his own benefit (rather than for the benefit of the defendant-employer) and that the defendant-employer only paid the expenses of the trip "as a 'fringe benefit' or gesture of good will," the plaintiff's injury was not compensable. Id. at 674, 189 S.E.2d at 746.
C. Application of Prior Caselaw to Plaintiff's Injury
In the present case, Defendants argue the Commission's determination that *895 Plaintiff's injury arose from his employment is (1) based solely on the fact that Tropical financially sponsored the laser tag event; and (2) inconsistent with the cases from North Carolina's appellate courts discussed above. We address each of these contentions in turn.
First, the evidence before the Commission demonstrated more than mere financial sponsorship of the laser tag outing by Tropical. The Commission concluded-and we agree-that the evidence of record showed Tropical also (1) expressly mandated employee attendance and implicitly encouraged participation in the laser tag and bowling activities; (2) fully financed the outing; and (3) benefited from the event. Indeed, the testimony from Plaintiff, Stone, Bauer, Hatton, and Marshall clearly demonstrates that Tropical required its employees to attend the laser tag and bowling activities by both taking attendance and making employees aware in advance that their attendance was mandatory.
The evidence also showed that actual participation in the activities was encouraged by Tropical. Specifically, Stone testified that Tropical *577 " wanted people to participate" and "set up teams," assigning each employee to a specific group and then assigning those groups to participate in either the laser tag or bowling activity. Furthermore, while Stone and Bauer both testified that "there weren't any formal requirements [to participate,]" each also conceded that Tropical did not expressly inform the Conference attendees that only their attendance, rather than their physical participation in the activities, was mandatory.[3]
Given that employees were required to attend the laser tag and bowling activities and were assigned to teams by Tropical (thereby being at least implicitly encouraged to participate), we agree with the Commission's conclusion that "the totality of the circumstances surrounding the purpose of and expectations surrounding Defendant-Employer's conference and Plaintiff's and other employees' participation therein" points in favor of a determination that Plaintiff's injury arose from his employment. See Chilton, 45 N.C.App. at 14-15, 262 S.E.2d at 348 (explaining that when employers sponsor recreational activities and an employee is injured, "it is clear that recovery will be allowed when attendance is required, [but] the question becomes closer when the degree of employer involvement descends to mere sponsorship or encouragement").
Finally, there was evidence demonstrating that Tropical benefited from the activities at issue. First, Stone-one of the organizers of the Conference-explained that the Sports Connection event was "an essential part [of the meeting content]" and that the Conference, as a whole, was calculated to benefit the company by providing training and education for its employees. Stone further testified that the evening's activities were also designed to bring Tropical employees from all of its regional offices together so that they could get to know each other. There was evidence that the teams were assigned purposefully to ensure a mix of employees from each of Tropical's six offices so that employees would mingle with members of offices other than their own and be able to "[p]ut a name with the face-or with the voice" when they needed to reach out to another office for assistance or support. The record supports the conclusion that this occasion for networking and team building, which brought together geographically distant employees who were often required to seek support or guidance from each *578 other over the telephone, constituted a benefit to Tropical "beyond the intangible value of improvement in employee[ ] health and morale that is common to all kinds of recreation and social life." Perry, 262 N.C. at 275, 136 S.E.2d at 646.
In sum, because Tropical (1) specifically required its employees to attend the event; (2) encouraged their participation in the laser tag activity; and (3) derived a business benefit from the Conference as a whole (of which the outing to Sports Connection was an "essential part") and from the team-building and networking opportunities generated thereby, *896 we believe this case is distinguishable from the facts and circumstances presented in Frost, Perry, Berry, Graven, Chilton , and Foster. None of those cases involved a situation where the employee's attendance was expressly mandated at the event in question or where the employer received a benefit from the event beyond an intangible improvement to employee morale. We therefore conclude that the nexus between the injury and the employment in the present case was substantially greater than that in the cases relied upon by Defendants. See Martin v. Mars Mfg. Co., 58 N.C.App. 577, 579-81, 293 S.E.2d 816, 818-19 (concluding that employee's injury sustained while dancing at employer-sponsored Christmas party was distinguishable from Perry and its progeny where event was sponsored and partially financed by employer, attendance was encouraged, and employer benefited from event "through such tangible advantages as having an opportunity to make speeches and present awards"), cert. denied, 306 N.C. 742, 295 S.E.2d 759 (1982). Accordingly, the Commission did not err in finding that Plaintiff's injury arose out of his employment with Tropical.
II. Injury by Accident
Defendants next contend that Plaintiff failed to prove that he suffered an injury by accident because Plaintiff was "unable to discern when exactly his alleged knee injury occurred and what exactly he was doing-whether it be twisting, jumping, running, bending, stooping, or nothing at all-when his knee pain began."
Our Court has previously explained that when determining compensability under the Act,
[t]he terms "accident" and "injury" are separate and distinct concepts, and there must be an "accident" that produces the complained-of "injury" in order for the injury to be compensable. An "accident" is an "unlooked for event" and implies a result produced by a "fortuitous cause." If an employee is injured while carrying on the employee's *579 usual tasks in the usual way the injury does not arise by accident. In contrast, when an interruption of the employee's normal work routine occurs, introducing unusual conditions likely to result in unexpected consequences, an accidental cause will be inferred. The " essence" of an accident is its "unusualness and unexpectedness...."
Gray v. RDU Airport Auth., 203 N.C.App. 521, 525, 692 S.E.2d 170, 174 (2010) (internal citations, select quotation marks, and brackets omitted).
For purposes of the Act, "an accident must result from 'an ... event,' and multiple events occurring over a period of time, therefore, do not constitute an 'accident.' " Lovekin v. Lovekin & Ingle, 140 N.C.App. 244, 248, 535 S.E.2d 610, 613, disc. review denied, 353 N.C. 266, 546 S.E.2d 105 (2000). Likewise, this Court has explained that in order to demonstrate an injury by accident, "[t]here must be a specific fortuitous event, rather than a gradual build-up of pain." Bowles v. CTS of Asheville, 77 N.C.App. 547, 551, 335 S.E.2d 502, 504 (1985). Defendants contend the Commission's findings of fact do not support its conclusion that Plaintiff sustained an injury by accident because it made "no determinative or meaningful finding regarding what 'specific fortuitous event' caused his alleged pain."
In its Opinion and Award, the Commission determined in findings of fact 6 and 22 that the right knee injury Plaintiff sustained while playing laser tag constituted an injury by accident because (1) "these activities were not activities [Plaintiff] normally performed as a Territory Manager/Outside Sales Representative for Defendant-Employer"; and (2) the act of playing laser tag "constituted an interruption of Plaintiff's regular work routine and the introduction of unusual conditions likely to result in unexpected consequences." Those findings of fact, which are supported by competent evidence in the record, demonstrate that the requisite "specific fortuitous event" was the laser tag activity itself. Evidence as to the exact moment in time or precise motion that tore his medial meniscus and lateral meniscus was not necessary to establish the fact that Plaintiff's injury while playing laser tag-a significant departure from Plaintiff's customary job duties *897 (which "were essentially administrative in nature and required him to perform normal and customary sales activities ... and customer service work")-constituted an injury by accident. See Gray, 203 N.C.App. at 525, 692 S.E.2d at 174 (explaining that in order for injury sustained to qualify as a compensable injury by accident for purposes of the Act, "the injury must involve more than the employee's performance of his or her usual and customary duties in the usual way"). *580 Plaintiff's testimony that he felt a "sharp pain" in his leg approximately 15 minutes into the activity and that he "could tell something was wrong" once he attempted to move from his position was sufficiently specific to demonstrate that the injury he suffered was neither a mere "gradual build-up of pain," Bowles, 77 N.C.App. at 551, 335 S.E.2d at 504, nor a result of "multiple events occurring over a period of time," Lovekin, 140 N.C.App. at 248, 535 S.E.2d at 613. Moreover, Defendants have not directed us to any case law requiring greater specificity under analogous circumstances so as to mandate a contrary result on this issue. Accordingly, the Commission did not err in determining that Plaintiff's right knee injury constituted an injury by accident.
III. Temporary Total Disability Benefits
In their final argument on appeal, Defendants contend that the Commission's determination that "Plaintiff was and remained disabled as of 24 May 2013, the date he underwent total knee replacement surgery" was not supported by sufficient evidence. We are not persuaded.
In its Opinion and Award, the Commission concluded that
[a]s a result of the injury and resulting knee surgeries, Plaintiff was unable to earn the same wages he was earning at the time of the injury in the same or any other employment beginning May 24, 2013, and he is therefore entitled to compensation pursuant to N.C. Gen.Stat. § 97-29 from that date until he returns to work or further order of the Industrial Commission.
Defendants argue that this award of temporary total disability benefits was improper because there was no evidence presented regarding Plaintiff's work restrictions following his knee replacement surgery. Under North Carolina law,
[t]he term "disability" means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment. N.C. Gen.Stat. § 97-2(9) (2013). Accordingly, to support a conclusion of disability, the Commission must find
(1) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in the same employment, (2) that plaintiff was incapable after his injury of earning the same wages he had earned before his injury in any other *581 employment, and (3) that this individual's incapacity to earn was caused by plaintiff's injury.
Hilliard v. Apex Cabinet Co., 305 N.C. 593, 595, 290 S.E.2d 682, 683 (1982).
Philbeck, --- N.C.App. at ----, 761 S.E.2d at 674.
It is the claimant's burden to establish the existence and extent of his disability, and he may do so by presenting medical evidence that he is physically incapable of work in any employment because of his injury. See Medlin v. Weaver Cooke Constr., LLC, 367 N.C. 414, 420-21, 760 S.E.2d 732, 736-37 (2014) (explaining that medical evidence demonstrating (1) the plaintiff is incapable of earning wages; and (2) this incapability was caused by the injury, will support legal conclusion of disability).
Here, Plaintiff underwent a total right knee replacement surgery performed by Dr. Barnett on 24 May 2013. Dr. Barnett was deposed on 11 June 2013, less than a month after this surgery and prior to Plaintiff's initial post-operative visit. Dr. Barnett testified as follows:
[Plaintiff's counsel:] How long do you anticipate [Plaintiff] will be recovering post-surgically from the surgery you undertook a couple of weeks ago? In other words, when will he be able to try to return to some kind of work or look for work?
*898 [Dr. Barnett:] I think typically the recovery is about three to six months after a knee replacement.
Given that Plaintiff's post-surgery follow-up appointment had not yet occurred at the time of the deposition, it was appropriate for Dr. Barnett to express his opinion as to Plaintiff's recovery in general terms for the average knee replacement patient. Contrary to Defendants' assertion on appeal, the above testimony from Dr. Barnett supports the Commission's finding of fact that Dr. Barnett "did not expect Plaintiff to be able to return to work for three to six months."
Moreover, we believe that this testimony concerning surgical recovery time-which was in direct response to a question as to when Plaintiff would be able to attempt to return to some kind of employment-was sufficient to establish that Plaintiff could not work in any capacity immediately following the surgery that was necessitated by his compensable injury. Thus, contrary to Defendants' assertions, the absence of evidence as to the type of limited or restricted work Plaintiff could perform does not bar his disability claim because Dr. Barnett's testimony supports the *582 conclusion that Plaintiff was incapable of performing any work after his knee replacement. Because the medical evidence indicated that Plaintiff was temporarily incapable of earning wages in any employment, there was sufficient evidence for the Commission to conclude that Plaintiff was temporarily totally disabled as of 24 May 2013. Defendants' argument on this issue is therefore overruled.
Conclusion
For the reasons stated above, we affirm the Commission's 10 June 2014 Opinion and Award.
AFFIRMED.
Judges STROUD and DILLON concur.

The Commission concluded that Plaintiff "failed to prove that his low back complaints were caused or aggravated by the injury he sustained to his right knee on August 18, 2011," and Plaintiff has not challenged this determination on appeal.

Defendants also challenge the Commission's determination that Plaintiff "sustained an injury by accident to his right knee arising out of ... his employment with Defendant-Employer" contained in finding of fact 22. As the issue of whether an accident arose out of the employment is a mixed question of law and fact, we deem it appropriate to address Defendants' contentions concerning finding 22 in our analysis of whether the findings of fact as a whole support the determination that Plaintiff's injury arose from his employment. See Gallimore v. Marilyn's Shoes, 292 N.C. 399, 402, 233 S.E.2d 529, 531 (1977) ("[T]he determination of whether an accident arises out of ... employment is a mixed question of law and fact, and this Court may review the record to determine if the findings and conclusions are supported by sufficient evidence.").

Stone did state that in past company outings various attendees had elected not to physically participate and that "there was never any ... forcing of anybody to do anything, other than be at the event."